UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE ENERGY TRANSFER PARTNERS, ) L.P. SHAREHOLDER LITIGATION ) ———————————————— ) ) This Document Relates To: ) ALL ACTIONS ) ) ————————————————— | Civil Action No. 17-cv-00044 (RGA) (CONSOLIDATED) CLASS ACTION |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF
THE SECURITIES EXCHANGE ACT OF 1934

MARGOLIS EDELSTEIN
HERBERT MONDROS
300 Delaware Avenue, Suite 800
Wilmington, DE 19801
Telephone: 302/888-1112
302/888-1119 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
PERETZ BRONSTEIN
SHIMON YIFTACH
YITZCHAK E. SOLOVEICHIK
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)

Local Counsel

Lead Counsel for Plaintiff

**AUGUST 11, 2017**

Plaintiffs Michael Gregory, Dana Alexander, and Robert Casebier ("Plaintiffs"), individually and on behalf of all others similarly situated, by the undersigned counsel, respectfully bring this class action for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and allege the following:

## SUMMARY OF THE ACTION

1.      This is a class action brought on behalf of holders of Energy Transfer Partners, L.P. ("ETP" or the "Partnership") against ETP, ETP's Board of Directors (the "Board"), Energy Transfer Equity, L.P. ("ETE") and Sunoco Logistics Partners L.P ("SXL") for violations of federal law arising out of the sale of the Partnership to SXL and its affiliates (the "Acquisition") without disclosing all material information concerning the Acquisition to ETP unitholders.  This matter arises under §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

2.      On November 21, 2016, ETP and SXL announced they had entered into a definitive merger agreement, which was subsequently amended on December 16, 2016 (the "Merger Agreement"), pursuant to which SXL acquired ETP, and ETP unitholders received just 1.5 SXL units per ETP unit held.

3.      To encourage and obtain unitholder support for the Acquisition, Defendants[1] filed a false and misleading joint registration statement and proxy statement (the "Proxy") with the SEC on March 24, 2017. The false and misleading Proxy convinced ETP unitholders to vote in favor of the Acquisition, as they approved the Acquisition on April 26, 2017.  The Acquisition closed on May 1, 2017.

---

[1]    ETP, the Board, ETE and SXL are herein collectively referred to as "Defendants."

4.      The Proxy omits material information with respect to the Acquisition, rendering several sections of the Proxy materially misleading in violation of §14(a) of the 1934 Act.  Certain defendants also violated §20(a) of the 1934 Act, as these defendants had the ability to exercise control over and did control a person or persons who violated §14(a) of the 1934 Act and/or SEC Rule 14a-9 by their acts and omissions as alleged herein.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act because the claims asserted herein arise under §§14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over Defendants because each defendant is either a partnership that is incorporated in, conducts business in and/or maintains operations in this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. §1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.  In addition, ETP, SXL, and ETE are Delaware limited partnerships.

## PARTIES

8.      Plaintiffs were during all times relevant hereto the owners of ETP common units.

9.      Defendant ETP was a Delaware limited partnership that maintained its principal executive offices at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  ETP's common units traded on the NYSE under the ticker symbol "ETP."

10.     Defendant SXL is a Delaware limited partnership and a party to the Merger Agreement.

11.     Defendant ETE is a Delaware limited partnership and a party to the Merger Agreement.  ETE controls ETP through ETE's ownership of Energy Transfer Partners, L.L.C. ("ETP GP LLC"), which is the general partner of Energy Transfer Partners GP, L.P. ("ETP GP").  ETE also owns all of the limited partner interests of ETP GP.  ETE GP owns 100% of the general partner interest and incentive distribution rights ("IDR") in ETP.  ETE also owns all the Class H units and Class I units in ETP, as well as approximately 3.3% of the outstanding ETP common units.  In addition, ETE indirectly owns a 0.1% membership interest in Sonoco Partners LLC ("SXL GP"), which owns 100% of the general partner interest and incentive distribution rights in SXL.

12.     Defendant Kelcy L. Warren ("Warren") was a director, Chairman of the Board, and Chief Executive Officer ("CEO") of ETP during all relevant times hereto. Warren also serves on ETE's board of directors.

13.     Defendant Ted Collins, Jr. ("Collins") was a director of ETP during all relevant times hereto. Collins also serves on ETE's board of directors.

14.     Defendant Michael K. Grimm ("Grimm") was a director, Chair of the Audit Committee, and Chair of the Compensation Committee of ETP during all relevant times hereto.

15.     Defendant Marshall S. McCrea ("McCrea") was a director of ETP during all relevant times hereto.  McCrea also serves on SXL's and ETE's boards of directors.

16.     Defendant Matthew S. Ramsey ("Ramsey") was a director and a member of the Audit Committee of ETP during all relevant times hereto. Ramsey also serves as Chairman of Sunoco LP's ("SUN") board of directors and serves on ETE's board of directors.

17.     Defendant David K. Skidmore ("Skidmore") was a director, member of the Audit Committee, and member of the Compensation Committee of ETP during all relevant times hereto.

18.     Defendant James R. Perry ("Perry") was a director and a member of the Audit Committee of ETP during all relevant times prior to December 31, 2016.

19.     The defendants identified in ¶¶12-18 are collectively referred to herein as the "Individual Defendants."

20.     Non-party ETP GP is a Delaware limited partnership, the general partner of ETP, and a party to the Merger Agreement.

21.     Non-party SXL GP is a Pennsylvania limited liability company, the general partner of SXL, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of holders of ETP units who were harmed by Defendants' actions described herein (the "Class").   Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

24.     The Class is so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but the names and addresses of the Class members can be ascertained from the books and records of ETP. There were more than 551,551,441 million outstanding units of ETP common units held by hundreds or thousands of individuals and entities scattered throughout the United States.

25.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.   The common questions include:

(a)     whether Defendants violated the federal securities laws as alleged in this complaint, including violating and/or participating in a scheme to violate §§14(a) and/or 20(a) of the 1934 Act; and

(b)     whether Defendants made false or misleading statements in the Proxy in violation of §14(a) of the 1934 Act.

26.     Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.

27.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class.

29.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Background**

31.     ETP was a Delaware limited partnership with common units traded on the NYSE under the symbol "ETP."  ETP was engaged in the transportation and storage of natural gas, natural gas liquids ("NGLs") and crude oil, and terminalling services and acquisition and marketing activities through SXL.  ETP held a controlling ownership interest in SXL through its ownership of a 99.9% membership interest in SXL GP, which owns 100% of the general partner interest and incentive distribution rights in SXL.

32.     ETE is a Delaware limited partnership with common units traded on the NYSE under the symbol "ETE."  ETE indirectly owns all of the incentive distribution rights and general partner interest in ETP.  Additionally, ETE directly owns approximately 3.3% of the outstanding ETP common units and indirectly owns a 0.1% membership interest in SXL GP, which owns 100% of the general partner interest and incentive distribution rights in SXL, as well as all of the ETP Class H units, which entitle ETE to receive 90.05% of the distributions paid to ETP with respect to SXL's incentive distribution rights and general partner interest.  ETE is a party to the merger agreement solely for purposes of certain provisions therein.  Thomas E. Long ("Long"), ETP's Chief Financial Officer ("CFO"), also serves as CFO of ETE.

33.     SXL is a Delaware limited partnership with common units traded on the NYSE under the symbol "SXL." SXL owns and operates a logistics business consisting of a geographically diverse portfolio of complementary pipeline, terminalling, and acquisition and marketing assets which are used to facilitate the purchase and sale of crude oil, NGLs and refined products.

**The Flawed Process Leading Up to the Merger Agreement**

34.     As set forth in the Proxy, the Acquisition was the result of a significantly flawed, extremely brief, single-bidder sale process during which ETP only discussed a potential transaction with SXL.   Indeed, ETP's Conflicts Committee – the group of individuals responsible for negotiating the Acquisition on behalf of ETP unitholders – was explicitly precluded from conducting an auction or otherwise soliciting interest from third parties. Specifically, the Proxy stated:

> The ETP Conflicts Committee was not authorized to, and did not, conduct an auction process or other solicitation of interest from third parties for the acquisition of ETP. Given ETE's control over ETP's general partner, it was unrealistic to expect or pursue an unsolicited third party acquisition proposal or offer for the assets or control of ETP, and it was unlikely that the ETP Conflicts Committee could conduct a meaningful auction for the acquisition of the assets or control of ETP.

35.     On October 19, 2016, ETE met with ETP and others regarding the possibility of a merger of ETP and SXL.  Then on October 31, 2016, Defendant Warren, who is also Chairman of the board of directors of LE GP, LLC, the general partner of ETE, met with Michael J. Hennigan ("Hennigan"), President and CEO of SXL, regarding the potential merger of ETP and SXL.  This was apparently the first time ETP and SXL met specifically to discuss the Acquisition during this sale process.  Within three weeks, ETP and SXL had approved the Acquisition and executed the Merger Agreement.

36.     From November 22, 2016 to December 8, 2016, ETP, SXL, and their counsel "had various discussions regarding alternative structures for the proposed transaction, and, in particular, the structure of the GP merger."  The Proxy fails to disclose the basis for discussing such alternative transaction structures.  Finally, on December 16, 2016, the parties entered into an amended Merger Agreement.

**The Merger Undervalues ETP**

37.     The consideration received by ETP unitholders in the Acquisition was inadequate.  Indeed, as various analysts recognized, ETP was worth far more than the amount its unitholders received in the Acquisition.

38.     For example, a November 21, 2016 *Seeking Alpha* article titled "Sunoco Logistics Partners Has Advantage In Merger With Energy Transfer Partners" stated that "the deal favors SXL shareholders and puts ETP shareholders at a disadvantage."  The article further states that, "[e]ffectively, ETP shareholders are not receiving any premium based on the closing prices of the prior day."  Additionally, "ETP shareholders will see a dividend cut by about 30%. . . .  ETP shareholders are at a disadvantage as they will see a dividend cut."

39.     Similarly, a November 21, 2016 *Forbes* article titled "Is There Value In Sunoco Logistics' Merger With Energy Transfer Partners?" stated that the merger consideration valued ETP "lower than its $39.37 closing price this past Friday (the entities say the price represents a 10% premium over the target's average closing price over the last 30 days)."  The article also stated that "[i]nvestors don't think much of Sunoco Logistics Partners LP (NYSE:SXL)'s $20 billion purchase of affiliate Energy Transfer Partners LP (NYSE:ETP), and with good reason."

40.     The merger consideration also failed to adequately compensate ETP unitholders for the significant synergies that resulted from the Acquisition.

41.     By contrast, ETP's officers and directors, which include all Individual Defendants, received substantial benefits as a result of the Acquisition.  Moreover, several of the Individual Defendants and officers of ETP suffered from conflicts of interest due to their combined loyalties to ETP, ETE, and SXL.  Indeed, as the Proxy states, "ETP's

directors and executive officers have interests in the merger that are different from, or in addition to, the interests of ETP unitholders generally," including the fact that "[c]ertain members of the ETP Board are also members of the ETE board of directors and/or the SXL Board and are executives of ETE and/or ETP."

**The Proxy Omits Material Information**

42.     To encourage and obtain unitholder support for the Acquisition, Defendants filed and disseminated the Proxy.  The Proxy contains numerous material omissions in violation of §14(a) of the 1934 Act, rendering several sections of it materially misleading. Without full and accurate disclosure of this material information, ETP unitholders were prevented from assessing the adequacy of the merger consideration, and thus, were prevented from casting an informed vote on the Acquisition.

**Material Omissions Regarding the Treatment of Class J Units in ETP's Distribution Reduction Case Projections**

43.     The Proxy omits any explanation of how, or even if, the Distribution Reduction Case Projections accounted for the Class J units, rendering the Distribution Reduction Case Projections, as well as conclusions derived therefrom, materially misleading.

44.     The omission of how or if the Distribution Reduction Case Projections accounted for the Class J units is material for several reasons.  First, this omission is material because the Class J units represented significant value for ETP unitholders.  The Class J units were granted by ETP to ETE in exchange for ETE granting $720 million in IDR subsidies to ETP.  Each Class J unit was entitled to an allocation of $10 million worth of ETP's depreciation, depletion, and amortization ("DD&A") expenses, meaning the 180 Class J units issued to ETE were collectively entitled to $1.8 billion in DD&A expenses. Because ETP is a partnership, the holder of the Class J units could use the $1.8 billion of

DD&A expenses to offset income on its individual tax returns.  Thus, the Class J units were worth approximately $810 in tax savings (assuming a 45% marginal tax rate), and their treatment had a significant impact on both the Distribution Reduction Case Projections and the conclusions in the Proxy based, at least in part, on the Distribution Reduction Case Projections.

45.     Second, an explanation of how or if the Distribution Reduction Case Projections accounted for the Class J units is material because these projections assumed a reversal of roughly 65% ($465 million) of the IDR subsidies granted in exchange for the Class J units.[2]  Thus, ETP unitholders needed to know whether the Distribution Reduction Case Projections accounted for a corresponding return of 65% of the Class J units, which were worth more than $500 million to ETP unitholders.  If the Distribution Reduction Case Projections did not account for the return of the Class J units then the Distribution Reduction Case Projections undervalue ETP by more than $500 million, rendering the several important conclusions derived from these projections materially misleading.  Unfortunately, the Proxy is completely silent as to how, or even if, the Distribution Reduction Case Projections accounted for the Class J units.

46.     Third, this information is material because the Distribution Reduction Case Projections represented what ETP management indicated was the most likely outcome for ETP as a standalone entity.  According to the Proxy, ETP would likely have to implement a distribution cut and, as a result, ETE would seek a reversal of a portion of the IDR subsidy

---

[2]     Specifically, the Proxy defines the Distribution Reduction Case Projections as being "derived from the ETP Status Quo Case Projections but adjusted to reflect (i) a hypothetical reduction in distributions in respect of ETP common units by approximately 20% in 2017 and that thereafter distributions in respect of ETP common units are made on a basis that results in ETP maintaining a cash coverage ratio of 1.1x, and (ii) *the hypothetical removal of a $465 million incentive distribution subsidy that was in place during 2017*."

if ETP remained a standalone entity.  The Distribution Reduction Case Projections were the only set of projections that assumed these events would occur.  Without knowing how or if the Class J units were accounted for in the Distribution Reduction Case Projections, ETP unitholders could not evaluate the accuracy of the set of projections that represented the supposed most likely outcome for ETP as a standalone entity.

47.     This omission of how or if the Distribution Reduction Case Projections accounted for the Class J units renders several sections of the Proxy materially misleading, including, but not limited to: (i) the Distribution Reduction Case Projections themselves, as this omission prevents ETP unitholders from understanding how the projections accounted for more than $500 million in value; (ii) Barclays Capital Inc.'s ("Barclays") *Discounted Distributable Cash Flow Analysis*, as this analysis explicitly applied the Distribution Reduction Case Projections; (iii) Barclays' *Selected Comparable Company Analysis* and *Selected Precedent Transactions Analysis*, as these analyses applied ETP projections (although these analyses do not specify whether they applied the Status Quo Projections, the Distribution Reduction Case Projections, or both); (iv) Barclays' conclusion that the merger consideration is fair, which is based, at least in part, on the Distribution Reduction Case Projections, the *Discounted Distributable Cash Flow Analysis*, the *Selected Comparable Company Analysis*, and the *Selected Precedent Transactions Analysis*; (v) the ETP Conflict Committee's conclusion that the merger consideration is fair and its recommendation to the Board to vote in favor of the Acquisition, both of which were based, at least in part, on the Distribution Reduction Case Projections; the *Discounted Distributable Cash Flow Analysis*, the *Selected Comparable Company Analysis*, and the *Selected Precedent Transactions Analysis*; and (vi) the Board's conclusions that the merger consideration is fair and recommendation to ETP unitholders

to vote in favor of the Acquisition, both of which are based, at least in part, on the Distribution Reduction Case Projections; the *Discounted Distributable Cash Flow Analysis*, the *Selected Comparable Company Analysis*, and the *Selected Precedent Transactions Analysis*.

**Material Omissions Concerning the Distribution Cut**

48.     The Proxy omits several pieces of material information regarding ETP management's conclusion that it would likely implement a 15% to 25% distribution cut to maintain a 1.1x cash coverage ratio if ETP remained a standalone entity, a conclusion not reached until apparently two days before executing the Merger Agreement.  This conclusion not only directly contradicted ETP management's previous statements and actions in the months leading to the Acquisition, but also drastically reduced the attractiveness of ETP as a standalone entity.

49.     The omitted information concerning ETP management's conclusion that it would likely implement a 15% to 25% distribution cut to maintain a 1.1x cash coverage ratio if ETP remained a standalone entity includes, but is not limited to: (i) an explanation of exactly when ETP management reversed course and concluded that it would likely implement a significant distribution cut if ETP remained a standalone entity; (ii) an explanation of why ETP management concluded that ETP needed to maintain a cash coverage ratio of 1.1x to retain its investment grade rating despite the facts ETP had not maintained a coverage ratio of 1.1x during any of the seven quarters preceding the Acquisition and ETP management had not previously indicated that preserving a cash coverage ratio of 1.1x was important for ETP; (iii) why ETP management used a cash coverage ratio of 1.1x in the Distribution Reduction Case Projections, especially given that ETP management set its cash coverage ratio goal at 1.05x during both the years preceding

and the months following the execution of the Merger Agreement; (iv) details regarding ETP management's assessment of the actual likelihood that ETP and/or ETE would receive an investment grade downgrade if ETP did not implement a distribution cut and/or obtain a cash coverage ratio of 1.1x; and (v) an explanation of what would happen to the value of ETP units if ETP and/or ETE received an investment grade downgrade.

50.     Information concerning ETP management's conclusion that it would likely implement a 15% to 25% distribution cut to maintain a 1.1x cash coverage ratio if ETP remained a standalone entity is material for several reasons.  First, this information is material because ETP unitholders required this information to understand why ETP management abruptly reversed course from its longstanding position that ETP would not implement distribution cuts, and apparently did so just days prior to executing the Merger Agreement and after it was almost certainly known that ETP's merger with SXL would result in distribution cuts for ETP unitholders.

51.     ETP management consistently stated and indicated through its actions that ETP would not implement a distribution cut in the months leading to the Acquisition.  For example, during ETP's earnings call on February 25, 2016, Defendant Warren stated, "[t]here's no contemplated distribution cuts at ETP whatsoever.  We've not looked at any scenario where that would be appropriate or necessary."

52.     ETP management reaffirmed this outlook regarding future distributions in its May 5, 2016 earnings call.  During this call, Long, CFO of ETP, stated, "[a]s we near conclusion of our major project backlog spend from the last couple of years, we continue to foresee significant EBITDA growth in 2017 and 2018 from completion of this backlog. As a reminder, the majority of these projects are backed by long-term fee-based contracts." Defendant Warren then stated that "ETP is in great shape."

53.     In July 2016, ETP and ETE entered into a transaction that was intended to further ensure that distributions would not be cut.  As was discussed in detail above, ETP granted ETE Incentive Distribution Right subsidies in exchange for $1.8 billion in tax-deductible DD&A expenses.  This transaction was intended to support ETP until it began tapping into its significant growth and distributable cash flow for unitholders in 2017 and 2018.  Regarding this transaction, Defendant Warren stated that "an IDR subsidy of this magnitude and potentially more IDR subsidies are absolutely appropriate, and ETE will do what it needs to do to support ETP."

54.     Additionally, as the chart below makes clear, ETP unitholders had not experienced a distribution cut since at least May 2008, which notably included periods during which ETP had made significant investments in years past and continued to keep distributions flat or increase them in the wake of those investments.



55.     Second, information concerning ETP management's conclusion that it would likely implement a 15% to 25% distribution cut to maintain a 1.1x cash coverage ratio if ETP remained a standalone entity is material because ETP unitholders needed to understand when and why ETP management determined the Partnership needed to

maintain a cash coverage ratio of 1.1x to retain its investment grade rating, as this determination seemingly came out of nowhere, was apparently made just days before Defendants entered into the Merger Agreement, was the supposed reason behind the proposed significant distribution cut, and did not align with ETP's pre or post-Acquisition cash coverage ratio goal of 1.05x.

56.     ETP did not discuss its need to maintain a cash coverage ratio of 1.1x in any of its Form 10-Ks or Form 10-Qs in at least the three years preceding the Acquisition, and instead set a cash coverage ratio goal of 1.05x in each of its 10-Ks filed during that period. Moreover, ETP did not actually maintain a cash coverage ratio of 1.1x for any of the seven quarters leading to the Acquisition.  Despite this fact, as identified by the chart in ¶54, ETP continued to increase distributions or keep distributions flat and ETP management continued to assure ETP unitholders that it would not reduce distributions during those seven quarters.  The following chart provides ETP's cash coverage ratio for each quarter during 2015 and 2016.[3]

| | 2016 | | | | 2015 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 |
| **ETP Distribution Coverage Ratio** | 0.91 x | 0.84 x | 0.84 x | 0.88 x | 1.08 x | 0.85 x | 1.08 x | 1.24 x |

57.     Roughly three months after executing the Merger Agreement, ETP discarded its 1.1x cash coverage target, and reverted back to its traditional cash coverage goal of 1.05x.  Specifically, ETP stated in a Form 10-K filed with the SEC on February 24, 2017 that "[ETP] intend[s] to continue our goal of maintaining a distribution coverage ratio

---

[3]     Cash coverage ratio provided by *http://mlpdata.com/financials/ETP*.

of 1.05x, thereby promoting a prudent balance between distribution rate increases and enhanced financial flexibility and strength while maintaining our investment grade ratings."

58.     The Proxy's omission of material information regarding ETP management's conclusion that it would likely implement a 15% to 25% distribution cut to maintain a cash coverage ratio of 1.1x and protect its investment grade rating if ETP remained a standalone entity renders several sections of the Proxy materially misleading, including, but not limited to: (i) the *Background of the Merger* section, as this section repeatedly discusses the distribution cut and cash coverage ratio but omits the material information identified above; (ii) the Distribution Reduction Case Projections, which assume that distribution cuts will be implemented that allow ETP to maintain a cash coverage ratio of 1.1x; (iii) Barclays' fairness opinion, particularly its *Discounted Distributable Cash Flow Analysis* and its *Pro Forma Merger Consequences Analysis*, as these analyses incorporate the Distribution Reduction Case Projections; (iv) Barclays' conclusion that the merger consideration is fair; (v) the ETP Conflict Committee's conclusion that the merger consideration is fair and recommendation to the Board to vote in favor of the Acquisition, and (vi) the Board's conclusion that the merger consideration is fair and recommendation to ETP unitholders to vote in favor of the Acquisition.

**Material Omissions from Barclays' Fairness Opinion**

59.     The Proxy omits material information from Barclays' fairness opinion, including, but not limited to: (i) an explanation as to why Barclays selected different assumed yields for the Status Quo Case Projections and the Distribution Reduction Case Projections in its *Discounted Distributable Cash Flow Analysis*; and (ii) the assumptions

underlying the *Selected Comparable Company Analysis* and *Selected Precedent Transactions Analysis* that Barclays used to value ETP and SXL.

60.     Barclays' specific reason for selecting different assumed yields in its *Discounted Distributable Cash Flow Analysis* is material because Barclays' manipulation of the yields had a substantial impact on the ultimate valuations produced and Barclays' *Discounted Distributable Cash Flow Analysis* is the only valuation analysis that explicitly incorporated the Distribution Reduction Case Projections, which represented the supposed most likely outcome for ETP as a standalone entity.

61.     Specifically, when generating its *Discounted Distributable Cash Flow Analysis*, Barclays applied a range of yields of 8% to 10% to the Status Quo Case and a range of 7.5% to 9.5% to the Distribution Reduction Case Projections.  Barclays' only explanation for this significant alteration was that it was relying on its "professional judgment and experience."  Barclays' adjustment of the terminal yield had a profound impact on the valuations.  By altering the terminal yield applied to the two sets of projections, Barclays' calculations indicated that ETP units were ***more valuable*** when assuming a 15% to 25% cut in distributions, even though that meant unitholders were receiving hundreds of millions of dollars less in projected distributions from 2017 to 2019.

62.     This omission rendered each section in the Proxy that includes conclusions derived, at least in part, from Barclays' *Discounted Distributable Cash Flow Analysis* materially misleading.  These sections include, but are not limited to: (i) Barclays' *Discounted Distributable Cash Flow Analysis*, (ii) Barclays' conclusion that the merger consideration is fair; (iii) the ETP Conflict Committee's conclusion that the merger consideration is fair and its recommendation to the Board to vote in favor of the

Acquisition; and (iv) the Board's conclusion that the merger consideration is fair and its recommendation to ETP unitholders to vote in favor of the Acquisition.

63.     The Proxy also omits material assumptions used by Barclays to calculate equity value ranges for ETP and SXL in the *Selected Comparable Company Analysis* and the *Selected Precedent Transactions Analysis*, as well as an explanation of which set of ETP projections Barclays relied on in each analysis.

64.     This information is material because ETP unitholders need to know the assumptions that Barclays used to comprehend and assess the accuracy of the *Selected Comparable Company Analysis* and the *Selected Precedent Transactions Analysis*. Moreover, ETP unitholders need to know which set of ETP projections Barclays relied on when generating these analyses because the Proxy indicates the Distribution Reduction Case Projections represented the more likely outcome for ETP as a standalone entity, meaning these analyses carry significantly different values depending on which set of ETP projections were used.

65.     This omission rendered several sections of the Proxy materially misleading, including, but not limited to: (i) the *Selected Comparable Company Analysis* and the *Selected Precedent Transactions Analysis*; (ii) Barclays' conclusion that the merger consideration is fair; (iii) the ETP Conflict Committee's conclusion that the merger consideration and recommendation to the Board to vote in favor of the Acquisition; and (iv) the Board's conclusion that the merger consideration is fair and recommendation to ETP unitholders to vote in favor of the Acquisition.

**Material Omissions Regarding Post-Acquisition Employment**

66.     The Proxy omits material information regarding post-acquisition employment for the officers and directors of ETP, particularly the timing and nature of all

communications regarding future employment that occurred prior to execution of the Merger Agreement.

67.     After the Acquisition, Defendant Warren became CEO of the post-Acquisition entity; McCrea became CCO of the post-Acquisition entity; Ramsey became the President of the post-Acquisition entity; Long became CFO of the post-Acquisition entity; and all of ETP's Board members became members of the post-Acquisition entity's board of directors.  The Proxy does not disclose the timing or nature of any conversation regarding post-Acquisition employment that occurred during the sale process, nor does it state that such communications did not occur.

68.     This information is material because unitholders needed it to understand whether ETP management and/or members of the Board had ulterior motives when they were making critical decisions.  For example, without this information, ETP unitholders did not know the extent of ETP management's potential conflicts at the time it concluded ETP would likely implement a significant distribution cut if it remained a standalone entity or when it generated ETP's projections.   Likewise, without this information, ETP unitholders did not know the extent of the Board's potential conflicts when it voted in favor of the Acquisition and recommended that ETP unitholders vote in favor of the Acquisition.

69.     The omission of material information regarding post-Acquisition employment for the officers and directors of ETP renders several sections of the Proxy materially misleading, including: (i) both sets of ETP's projections, as these were generated by potentially conflicted officers of ETP; (ii) the ETP Conflict Committee's conclusion that the merger consideration is fair and its recommendation to the Board to vote in favor of the Acquisition; and (iii) the Board's conclusion that the merger consideration is fair and its recommendation to ETP unitholders to vote in favor of the Acquisition.

**All Defendants Had Control Over the Content of the Proxy**

70.     All Defendants had control over the information they proffered to ETP unitholders in the Proxy.  For example, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the content and dissemination of the Proxy by virtue of their positions as officers and/or directors of ETP, their participation in and/or awareness of ETP's operations, their intimate knowledge of the false statements contained in the Proxy, and the powers granted to them by the Merger Agreement.  Thus, the Individual Defendants were responsible for both the false and misleading statements in the Proxy identified above and causing ETP to the file the false and misleading Proxy.

71.     SXL, like the Individual Defendants, had the power to influence and control and did influence and control, directly or indirectly, the content of the Proxy by virtue of its participation in drafting and filing the Proxy, its intimate knowledge of the false statements contained in the Proxy, and the powers granted to it under the Merger Agreement.  Thus, SXL was responsible for the false and misleading statements in the Proxy identified above and for causing ETP to file the false and misleading Proxy. Specifically, Section 5.1 of the Merger Agreement states:

>        Section 5.1 Preparation of the Registration Statement and the Proxy Statement; ETP Unitholders Meeting.
>
>        (a) As soon as practicable following the date of this Agreement, ***ETP and SXL shall jointly prepare*** and ETP shall file with the SEC the Proxy Statement, and ETP and SXL shall jointly prepare and SXL shall file with the SEC the Registration Statement, in which the Proxy Statement will be included as a prospectus. Each of ETP and SXL shall use its reasonable best efforts to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and keep the Registration Statement effective for so long as necessary to consummate the transactions contemplated hereby. ***ETP and SXL shall use their respective reasonable best efforts to cause the Proxy Statement to be mailed to the ETP Unitholders as promptly as practicable after the Registration Statement is declared effective under the Securities Act***. No filing of, or

amendment or supplement to, the Registration Statement will be made by SXL, and no filing of, or amendment or supplement to, the Proxy Statement will be made by ETP, without providing the other party a reasonable opportunity to review and comment thereon. If at any time prior to the Effective Time any information relating to ETP or SXL, or any of their respective Affiliates, directors or officers, is discovered by ETP or SXL that should be set forth in an amendment or supplement to any of the Registration Statement or the Proxy Statement, so that any such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be jointly prepared and promptly filed with the SEC and, to the extent required by Law, disseminated to the ETP Unitholders. The parties shall notify each other promptly of the receipt of any comments from the SEC or the staff of the SEC and of any request by the SEC or the staff of the SEC for amendments or supplements to either the Proxy Statement or the Registration Statement or for additional information and shall supply each other with copies of (i) all correspondence between it or any of its Representatives, on the one hand, and the SEC or the staff of the SEC, on the other hand, with respect to the Proxy Statement, the Registration Statement or the transactions contemplated hereby and (ii) all orders of the SEC relating to the Registration Statement.

(b) ETP shall, as soon as practicable following the date of this Agreement, establish a record date for, duly call, give notice of, convene and hold a special meeting of the ETP Unitholders (the "**ETP Unitholders Meeting**") for the purpose of obtaining the ETP Unitholder Approval. Subject to Section 5.3, ETP shall, through the ETP Managing GP Board, recommend to the ETP Unitholders adoption of this Agreement (the "**ETP Board Recommendation**"). Unless the ETP Managing GP Board has effected an ETP Adverse Recommendation Change in accordance with Section 5.3, ETP shall use its reasonable best efforts to solicit from the ETP Unitholders proxies in favor of the Merger and to take all other action necessary or advisable to secure the ETP Unitholder Approval. The Proxy Statement shall include a copy of the ETP Fairness Opinion and (subject to Section 5.3) the ETP Board Recommendation. Notwithstanding anything in this Agreement to the contrary, unless this Agreement is terminated in accordance with Section 7.1, ETP shall submit this Agreement for approval by the ETP Unitholders at such ETP Unitholders Meeting. Notwithstanding anything in this Agreement to the contrary, ETP may postpone or adjourn the ETP Unitholders Meeting (i) to solicit additional proxies for the purpose of obtaining the ETP Unitholder Approval, (ii) for the absence of quorum, (iii) to allow reasonable additional time for the filing and/or mailing of any supplemental or amended disclosure that ETP has determined after consultation with outside legal counsel is necessary under applicable Law and for such supplemental or amended disclosure to be disseminated and

reviewed by the ETP Unitholders prior to the ETP Unitholders Meeting and (iv) if ETP has delivered any notice contemplated by Section 5.3(d) and the time periods contemplated by Section 5.3(d) have not expired.

**SXL Controlled ETP Pursuant to the Terms of the Merger Agreement**

72.    SXL had direct supervisory control over ETP pursuant to the Merger Agreement, as SXL was able to restrict the conduct of ETP's business prior to the consummation of the Acquisition.  For example, Section 5.2(a) of the Merger Agreement states in part:

> Section 5.2 Conduct of Business.
>
> (a) Except (i) as expressly permitted by this Agreement, (ii) as set forth in Section 5.2(a) of the ETP Disclosure Schedule, (iii) as required by applicable Law, (iv) as provided for or contemplated by any ETP Material Contract in effect as of the date of this Agreement (including the ETP Partnership Agreement) or (v) ***as agreed in writing by SXL*** (which consent shall not be unreasonably withheld, delayed or conditioned), during the period from the date of this Agreement until the Effective Time, ETP shall, and shall cause each of its Subsidiaries and the ETP Joint Ventures to, (A) conduct its business in the ordinary course of business consistent with past practice, (B) use commercially reasonable efforts to maintain and preserve intact its business organization and the goodwill of those having business relationships with it and retain the services of its present officers and key employees, (C) use commercially reasonable efforts to keep in full force and effect all material ETP Permits and all material insurance policies maintained by ETP, its Subsidiaries and the ETP Joint Ventures, other than changes to such policies made in the ordinary course of business, and (D) use commercially reasonable efforts to comply in all material respects with all applicable Laws and the requirements of all ETP Material Contracts.

**COUNT I**

**For Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and ETP**

73.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

74.    The Individual Defendants and ETP filed with the SEC and/or disseminated to ETP unitholders the Proxy, which contains materially false and misleading statements.

The Proxy failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and ETP.  In the Proxy, the Individual Defendants and ETP made untrue statements of material fact and omitted material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions, the Individual Defendants and ETP were aware of this information and of their duty to disclose this information in the Proxy.

76.     The Individual Defendants and ETP were at least negligent in filing the Proxy with these materially false and misleading statements and omissions.

77.     The false and misleading statements and omissions in the Proxy are material in that a reasonable investor would consider them important in deciding how to vote on the Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and other information reasonably available to unitholders.

78.     By reason of the foregoing, the Individual Defendants and ETP have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.  As a result of these violations, Plaintiffs and all other Class members will be harmed.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants, SXL and ETE

79.     Plaintiffs repeat and reallege each allegation set forth herein.

80.     The Individual Defendants acted as controlling persons of ETP within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of ETP, their participation in and/or awareness of the Partnership's

operations, and their intimate knowledge of the false statements contained in the Proxy, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Partnership, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

81.    In particular, each of the Individual Defendants had direct and/or supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy contains the recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of these documents.

82.    SXL acted as a controlling person of ETP and the Individual Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.  Pursuant to the Merger Agreement, SXL possessed control over ETP and the Individual Defendants.

83.    In particular, SXL had direct supervisory control over ETP pursuant to the Merger Agreement, as SXL was able to restrict the conduct of ETP's business prior to the consummation of the Acquisition, subject to specific limitations, which may have delayed or prevented ETP from undertaking business opportunities that arose before the completion of the Acquisition and that, absent the Merger Agreement, ETP might have pursued. Among other things, SXL had direct supervisory control over the preparation and dissemination of the Proxy, including the composition of each document and the information ETP and the Individual Defendants disclosed therein, as well as the information ETP and the Individual Defendants omitted or misrepresented in the Proxy.

84.    Each of the Individual Defendants and SXL was provided with or had unlimited access to copies of the Proxy prior to and/or shortly after these documents were

issued and had the ability to prevent the issuance of the false and misleading statements contained therein or cause the statements to be corrected.

85.     In addition, as the Proxy sets forth, the Individual Defendants, SXL, and ETE were involved in negotiating, reviewing and/or approving the Acquisition.  The Proxy purports to describe the various issues and information that the Individual Defendants, SXL and ETE reviewed and considered – descriptions that had input from the Individual Defendants, SXL and ETE.

86.     ETE acted as a controlling person of ETP and the Individual Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.  As explicitly stated in the Proxy, "ETE controls ETP through ETE's ownership of ETP GP LLC, which is the general partner of ETP GP.  ETE also owns all of the limited partner interests of ETP GP. ETP GP owns 100% of the general partner interest and incentive distribution rights in ETP." Moreover, by virtue of its control over ETP, its participation in and/or awareness of the Partnership's operations, its participation throughout the sale process, the significant overlap among its officers and directors and the officers and directors of ETP and SXL, and its intimate knowledge of the false statements contained in the Proxy, ETE had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Partnership, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

87.     By virtue of the foregoing, the Individual Defendants, SXL and ETE have violated §20(a) of the 1934 Act.  The Individual Defendants and SXL had the ability to exercise control over and did control a person or persons who violated §14(a) of the 1934 Act and SEC Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants and SXL are liable pursuant to

§20(a) of the 1934 Act.  As a direct and proximate result of these defendants' conduct, Plaintiffs and all other Class members will be harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants violated the federal securities laws as set forth herein by, *inter alia*, disseminating and filing the Proxy in connection with the Acquisition, which contains materially false and misleading statements about the Acquisition;

C.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

D.    If rescinding the Merger Agreement is not feasible, awarding rescissory damages in favor of Plaintiffs and the Class;

E.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 11, 2017

MARGOLIS EDELSTEIN
HERBERT MONDROS (#3308)


*/s/Herbert W. Mondros*
HERBERT MONDROS

300 Delaware Avenue, Suite 800
Wilmington, DE  19801
Telephone:  302/888-1112
302/888-1119 (fax)|
hmondros@margolisedelstein.com

Local Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
RANDALL J. BARON (*pro hac vice* forthcoming)
DAVID T. WISSBROECKER (*pro hac vice*
forthcoming)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

BRONSTEIN, GEWIRTZ & GROSSMAN,
   LLC
PERETZ BRONSTEIN (*pro hac vice* forthcoming)
SHIMON YIFTACH (*pro hac vice* forthcoming)
YITZCHAK E. SOLOVEICHIK
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)

Lead Counsel for Lead Plaintiffs Michael
Gregory, Dana Alexander and Robert Casebier